UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL NO. 655, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 4:04CV480 CDP |
| ST. JOHN'S MERCY HEALTH SYSTEM d/b/a ST. JOHN'S MERCY MEDICAL CENTER, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

The union moves to confirm an arbitration award issued in its favor and against the Medical Center. The award was issued in April of 2004 and orders the Medical Center to discharge registered nurses who failed to pay their union fees and dues as required by the collective bargaining agreement in effect at the time.[1] If confirmed, the award would require the dismissal of 73 registered nurses. The Medical Center seeks to vacate the award, claiming that the simultaneous firing of 73 registered nurses would violate the public policy requiring hospitals to maintain a nursing staff sufficient to meet patient needs.

---

[1]The award also requires the Medical Center to pay the outstanding fees and dues to the union.

The parties agreed that no hearing or trial was necessary to resolve this matter and submitted the case to me for decision by cross-motions for summary judgment. After careful review of the entire record[2] in light of the relevant standards, I will confirm the arbitration award.

## Standards Governing Summary Judgment

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court views the facts and inferences from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact

---

[2]The union has claimed throughout these proceedings that I must evaluate the Medical Center's public policy defense based solely on the record presented to the arbitrator without consideration of any additional evidence. I rejected this argument in my Order dated December 6, 2004, finding that the Eighth Circuit Court of Appeal's decision in Teamsters Local Union 682 v. KCI Construction Co., 384 F.3d 532 (8th Cir. 2004), obligated me to consider additional evidence and make factual findings as necessary to decide the validity of the Medical Center's public policy defense. Since that Order, the union has gone to great pains to attempt to distinguish this case from KCI Construction in order to limit my consideration of the public policy defense to the evidence presented during the arbitration. I need not decide whether the union's position is the correct one because my decision to confirm the award remains the same whether I review strictly the evidence presented during the arbitration hearing or all the evidence in the record, including the additional testimony presented by the Medical Center in support of its motion for summary judgment. For this reason, I have considered all evidence submitted by the Medical Center in support of its public policy defense.

and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986).  Once the moving party has met this burden, the

nonmoving party may not rest on the allegations in its pleadings but by affidavit or

other evidence must set forth specific facts showing that a genuine issue of material

fact exists.  Fed. R. Civ. P. 56(e).  "[A] complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts

immaterial."  Celotex, 477 U.S. at 323.

## Undisputed Facts

At the time the arbitration award was issued, United Food and Commercial

Workers Union Local No. 655 was the exclusive bargaining representative of all

regular full-time and part-time registered nurses employed by St. John's Mercy

Medical Center.  The Medical Center is an acute and tertiary care hospital and

employs about 1,400 registered nurses.  Its services include emergency medical

care, surgical services, the region's only burn center, critical care services,

obstetrics and neonatal intensive care.

## The Collective Bargaining Agreement

During the relevant time period, the union and the Medical Center were

parties to a collective bargaining agreement[3] which contains the following union

security provision:

> Section 4.1 Conditions of Employment.  As a condition of continued employment, all RNs in the collective bargaining unit shall, prior to ninety-one (91) days after the start of their employment with the Medical Center, or the effective date of this agreement, whichever is later, become members of the Union and pay to the Union the periodic monthly dues and initiation fees uniformly required of all Union members.  The Union shall certify to the Medical Center the amount that constitutes periodic monthly dues.

> Section 4.2 Discharge of Non-members.  The failure of any RN to become or remain a member of the Union at such required time by paying initiation fees and regular monthly dues uniformly required by a condition of membership shall obligate the Medical Center, upon written notice from the Union to such effect and to the further effect that Union membership was available to such RN on the same terms and conditions generally available to other members, to discharge such RN within ten (10) working days following the receipt of such notice.

> Section 4.3 Hold Harmless.  The Union recognizes and accepts sole responsibility for any action arising out of any Union demand for the discharge of any RN pursuant to the terms of this Agreement.  In any and all cases where the Medical Center complies with the Union demand in reliance upon a written notice respecting membership in the Union, the Union shall indemnify and hold the Medical Center harmless for any resulting liability, including, but not limited to, back pay, lost benefits, other damages, interest, costs, expenses, and reasonable attorney's fees.

---

[3]The collective bargaining agreement expired on October 22, 2004.  The parties eventually entered into a new agreement, following protracted negotiations and a strike.  The new agreement, effective for the period between October 23, 2004 and October 22, 2007, allows members of the bargaining unit to opt out of membership in the Union and the corresponding obligation to pay fees and dues.

Step 5 of the collective bargaining agreement provides that in the event the parties cannot settle a grievance, an impartial arbitrator will be selected to resolve the dispute. The agreement further states that "[t]he arbitrator shall not have the power to add to, subtract from, or modify the terms of this Agreement."

**The Arbitration**

On December 15, 2003, the union and the Medical Center arbitrated a grievance filed by the union over the union security provision contained in the collective bargaining agreement.[4] The union's grievance asserted that the Medical Center had violated Section 4.2 by refusing to discharge registered nurses who had not paid their union dues and fees. The Medical Center contended that the union had not provided adequate notification of the delinquencies to the nurses and the Medical Center as required by the agreement. The Medical Center alternatively asserted that it could not comply with the union's demand because the simultaneous dismissal of so many nurses would render the hospital unable to meet patient needs. The Medical Center maintained that public policy prohibited the Medical Center

---

[4]This arbitration was actually the second arbitration between these parties over the same issue. The first arbitration took place on April 16, 2003 before Arbitrator Robert Bailey. Arbitrator Bailey also found in favor of the Union and ordered the discharge of all non-compliant registered nurses. The parties apparently settled that dispute after the award was issued, and none of the nurses were actually discharged. The arbitration award at issue in the present case applies to nurses who failed to pay initiation fees and dues to the Union after Arbitrator Bailey's award was issued.

from firing registered nurses at a time when nurses were in short supply nationwide and could not be readily replaced.

Both parties were represented by counsel during the hearing and were given the opportunity to present evidence to Arbitrator Thomas A. Cipolla, who found the following facts relevant to the Medical Center's public policy defense:

> The only witness called at the hearing was Cristine Crain, who has been the Chief Nurse Executive for the Medical Center for 16 years. She had been employed there for 30 years, starting as a staff nurse, and had worked her way up to the present position. She testified that she was familiar with the Union's request to discharge RNs . . . Crain also testified that she created another document in preparation for the arbitration. This document was marked Employer Exhibit No. 2. It contains three columns, which are unit/department, current vacancy rate in unit, and the vacancy rate if the Medical Center discharged the RNs the Union seeks to have discharged. The following rates are by department, the first rate being the current vacancy rate in the unit as of 12/12/2003 and the vacancy rate if an RN was discharged in that unit/department; critical care 16 %, then 20 %; family focus 0 %, then 12 %; education - maternal child 0 %, then 10 %; medical 16 %, then 21 %; natural family planning - practitioners 0 %, then 25 %; NICU - neonatal nurse practitioner 11 %, then 15 %; operating room 18 %, then 25 %; and operating room - recovery room 9 %, then 17 %.

> Crain also testified that there are other units which did not appear on Exhibit 2 with respect to vacancies which are referred to in Exhibit 1, and these units would also be detrimentally affected. For example, in the education department, there is only one RN in that department. In emergency department - pediatrics, there are only 2 nurse practitioners, and discharging one there would only leave 1 nurse practitioner to fill the 2 positions. Another unique department is the JFK clinic, where the Medical Center cares for uninsured and underinsured patients. In that department, there is only 1 RN. She also testified that it would not

be possible to hire a temporary RN to fill any of these positions because the people in the positions have a specialized set of skills that they would not be able to hire through temporary agencies. Crain also testified that it would be difficult to find somebody in the maternal child education position through a temporary agency and the natural family planning practitioner. Neonatal nurse practitioners are another group you cannot find from a temporary agency.

On cross-examination, Crain testified that the Medical Center uses per diem nurses who are employed on three different levels, tier one, tier two and tier three. Depending upon their level of per diem, they are committed to give a certain number of scheduled shifts on an ongoing basis or within that schedule, and they can work as few as two shifts a month or they might work as many as 12 or 16 shifts per month. She also said that as the need increases, the Medical Center can allow them to increase their hours if they wish to do so. She admitted that there have been some grievances filed by the per diem nurses who wanted to have more hours and the Medical Center indicating that they did not want to schedule them for that many. However, she added that before they commit to temporary agencies for a month, the Medical Center allows the per diems to pick up as many shifts as they will pick up before the Medical Center goes to the temporary agencies. Furthermore, the per diem nurses the Medical Center has have fallen significantly short in picking up or helping out with the additional shifts, which is the reason that the Medical Center is using temporary agencies.

Crain also testified that the Medical Center has limited the number of tier 3 and tier 2 per diem RNs. She said they earn a higher rate of pay. She also described the supplemental nurse staffing program whereby nurses are paid a higher incentive rate of pay to pick up shifts above and beyond their commitment.

She also testified that she recalled at the end of September of 2001 there was a three-day strike and that the hospital had a ten-day notice of that strike, which was required by law. She said that during that strike, they did hire temporary agencies to staff during a three-day

strike but did not agree with Union counsel that it was 180 RNs, but somewhat less than that.

Crain stated that the overall vacancy rate at the Medical Center has been less recently but anticipates that it is going up again because of the new beds that are opening in January.

In regards to replacing an RN, she said that replacement cost to recruit and replace a registered nurse is estimated to be $40,000 or more.

In rejecting the Medical Center's public policy defense, Arbitrator Cipolla concluded as follows:

The Medical Center's arguments regarding the shortage of RNs and the need for RNs for special skills is compelling. However, the collective bargaining agreement provides for no exceptions. Any notion by the Medical Center that its obligation to terminate delinquent RNs is negated by any other provision in the agreement and cannot justifiably be found. Its argument that the termination of such nurses is against "public policy" is also compelling but has little merit where the Medical Center could have carved out some exceptions in the collective bargaining agreement or not agreed to a closed shop.

In conclusion, there is no other resolution to this case other than to conclude that the Medical Center violated the collective bargaining agreement when it did not discharge those nurses who were delinquent when notified in writing by the Union.

Arbitrator Cipolla accordingly sustained the union's grievance on April 2, 2004.

The award provides:

The Medical Center must discharge bargaining unit RNs who are not in compliance with the Union dues and fees obligation under Article 4 at any time after the settlement of the award issued by Arbitrator Robert G. Bailey through the date of this arbitration hearing, December 15,

2003. The Medical Center should also reimburse the Union for those dues and fees, without interest, which would have been paid but for the Medical Center's failure to comply with Article 4 during the same period. Finally, the Medical Center is ordered to comply with all of its Article 4 obligations upon written notice by the Union of fee or Union due deficiencies. No other remedy requested is deemed appropriate.

## The National Labor Relations Board Case

Because the Medical Center failed to comply with Arbitrator Cipolla's award, the union filed an unfair labor practice charge with the National Labor Relations Board alleging that the Medical Center violated Section 8(a)(5) and (1) of the Labor Management Relations Act by refusing to discharge nurses who failed to pay their union fees and dues. The union filed this action to confirm the arbitration award the day after it filed the NLRB charge.

Following an evidentiary hearing, the NLRB issued its decision in the case styled St. John's Mercy Health System d/b/a St. John's Mercy Medical Center, Case 14-CA-27851, on March 31, 2005. The Medical Center presented its public policy defense to the NLRB, which summarized the supporting evidence as follows:

> The Respondent argues that its refusal to give effect to the contract is justified by a severe shortage of RNs in the St. Louis area. In support of this position, the Respondent introduced testimony concerning the RN vacancy rate - i.e., the number of vacant RN positions at the hospital expressed as a percentage of the number of RNs that the hospital had determined it needed to properly care for patients. The testimony was that the overall RN vacancy rate for hospitals in the State of Missouri has recently been about 9 to 12 percent. The same

vacancy rate is seen for hospitals in the St. Louis area. The Respondent's vacancy rate during the year prior to trial has typically been somewhat lower than those statewide and St. Louis averages - between 7 and 9 percent. The same vacancy rate is seen for hospitals in the St. Louis area. The Respondent's vacancy figures, moreover, may have been inflated during some months by its decision to add a significant number of hospital beds in January 2004, thereby increasing its staffing needs. The Respondent's vacancy rate at the time of trial had declined to between 4 and 6 percent. [ftnt 9: Christine Craine, the Respondent's Chief Nurse Executive, initially testified on direct examination that the hospital's current RN vacancy rate was six percent. Tr. 36. Then on cross-examination she stated that the vacancy was now "around 5 or 6" percent. Tr. 69. Later during cross examination she conceded that at a recent meeting of the Professional Nursing Practice Committee in August 2004 she "might" have reported that the Respondent's RN vacancy rate was only 4 percent. Tr. 75-76.] Discharge of the 14 RNs identified by the General Counsel in this case would result in an increase of approximately 1 percent in the Respondent's vacancy rate, still leaving the Respondent in a considerably better position than is generally the case for hospitals in the St. Louis area and across Missouri. The Respondent states that it is required under Missouri's Hospital Licensing Law and Missouri Department of Health guidelines to maintain adequate nurse staffing, but the record does not show that terminating the 14 defaulting RNs would bring it out of compliance with any such requirements, and indeed such a result seems unlikely given the evidence regarding the higher vacancy rates in the Respondent's own recent past, and at other hospitals across the State. [ftnt 10: Moreover, the Respondent has not shown that violating its obligations under the collective bargaining agreement and federal labor law is the only way to maintain the necessary staffing levels. Certainly it has other, lawful, means available to do that, such as improving the terms and conditions of employment for RNs].

In rejecting the Medical Center's public policy defense to the fair labor practice charge, the NLRB found in relevant part as follows:

The Respondent argues that it is having difficulty recruiting and retaining RNs because of a nursing shortage, and therefore should be granted a public policy exemption from its obligations under the collective-bargaining contract provision, and Section 8(a)(5) and (1) of the Act. On the record in this case, it is highly unlikely that the Respondent's compliance with the union-security provisions would have significant implications contrary to public policy, much less any implications serious enough to outweigh the public policy in favor of meaningful collective bargaining and industrial peace. However, the more important point is that the Board has never recognized the type of generalized public policy exemption sought by the Respondent. The Respondent does not cite a single case that even suggests such an exemption exists under Board law . . . There is no . . . provision in the Act providing that health care providers, or any other employers, may abrogate portions of a collective-bargaining contract because the employer considers what it agreed to excessively burdensome. If the Respondent wants to add such a exception to the Act, it must make its plea to the legislative branch, not in this forum.

For the reasons discussed above, I conclude that, since December 19, 2003, the Respondent has violated Section 8(a)(5) and (1) of the Act by refusing to give effect to article 4, section 4.2 of the collective-bargaining agreement, which requires it, upon request of the Union, to terminate unit RNs who have not met the contractual requirement of paying dues or fees to the Union.

(internal citations and footnotes omitted).

Accordingly, the NLRB found that the Medical Center engaged in unfair labor practices by refusing to discharge the non-compliant nurses and ordered the Medical Center to cease and desist its refusal to comply with the union security provision of the cba.

The Medical Center filed a petition for review of the NLRB's decision with

the Eighth Circuit Court of Appeals on May 13, 2005.  The case remains pending.

## Additional Evidence Submitted in this Action

The parties each submitted excerpted portions of Christine Crain's deposition

testimony taken for use in this case on April 27, 2005.[5]  I have read the portions

submitted by each party, which contain the following additional facts relevant to the

Medical Center's public policy defense:

> 1.  The Medical Center currently has a 7 percent vacancy rate from
> budgeted positions[6], which it fills through the use of special staffing
> incentive programs to encourage nurses to work more hours than
> scheduled, temporary nurses, per diem nurses[7] and the use of clinical
> supervisors;

---

[5]Crain also testified at the arbitration and NLRB hearings, as indicated above.

[6]According to Crain, this vacancy rate is calculated by estimating in its yearly
financial plan the number of patients the Medical Center is expected to care for
during the year and identifying the number of nurses that will be required to care for
that number of patients.  (Deposition Tr. at 32).  She further testified that the
Medical Center tries to recruit a higher number of nurses than the budgeted vacancy
rate in the event that the actual number of patients exceeds the projected number.

[7]During the arbitration hearing, Crain explained that per diem nurses are
nurses employed by the Medical Center who take "leftover hours after all full-time
and part-time — regular part-time nurses are scheduled."  (Hearing Tr. at 34).    The
per diem nurses generally receive a higher rate of pay to work more hours. (Id.)
Many of the per diem nurses at the Medical Center have filed grievances over not
being permitted to work more hours.  (Id.)  There are about 200 per diem nurses at
the Medical Center.  (Id. at 35).  Because per diem nurses are not considered
"regular" full or part-time nurses, the Medical Center's vacancy rates are calculated
without factoring in their participation in staffing.

2. During the nursing strike of December 2004, the Medical Center replaced striking nurses with volunteer nurses from the community, its own non-striking nurses, nurses from other Mercy healthcare systems and temporary nurses provided by a nursing agency specializing in strike staffing.   The Medical Center was able to meet its nursing staffing needs during the strike period;

3. The Missouri Department of Health and Senior Services inspected the Medical Center during the strike and did not find any staffing deficiencies; and

4. Nurses with special skill sets, such as those working in critical care units, are difficult for the Medical Center to find and would be especially hard to replace, although the Medical Center was able to staff these positions during the strike through the temporary nursing agency and other methods.

The Medical Center has also submitted the affidavit of Joan Hrubetz, Dean and Professor of Nursing at St. Louis University School of Nursing, in support of its motion for summary judgment.  Hrubetz is not employed by the Medical Center, but instead has offered her testimony as an expert witness on the issues of the nationwide nursing shortage and the potential impact of discharging 73 nurses at the Medical Center.  The union moved to strike this affidavit when it was filed, but I denied the motion, in part because I also granted the parties an opportunity to conduct discovery and submit supplemental briefing in support of summary judgment.  For that reason, I entered a case management order on January 28, 2005, requiring, among other things, the disclosure of all expert witnesses in compliance

with Rule 26(a)(2) by February 1, 2005.

The Medical Center apparently did not comply with the provisions of my case management order and disclose Hrubetz as an expert witness, but it nevertheless continues to rely on her testimony in support of its public policy defense. The union asks me to disregard Hrubetz' testimony because the Medical Center failed to properly disclose her as required by the case management order. The Medical Center responds that the union is not prejudiced by its failure to comply with the case management order because Hrubetz' affidavit contained most of the information required by the expert disclosure rule. Despite its own proverbial glass house, the Medical Center also opposes the union's request on procedural grounds by claiming that the union failed to comply with Rule 37 of the Federal Rules of Civil Procedure by requesting relief from the Court without first attempting to resolve the dispute with the Medical Center.

The Medical Center failed to comply with my case management order and the Federal Rules of Civil Procedure regarding the designation of experts, which would normally lead me to strike the witnesses' testimony from the record. In this instance, however, the union did not properly present the issue to me by filing a second motion to strike or by raising the issue at a time when the Medical Center would have had the opportunity to cure the defects in its disclosure. For this reason,

and because the substance of Hrubetz' testimony does not change the outcome of my decision, I have considered it in conjunction with all the other evidence in the record. Hrubetz testified in relevant part as follows:

> It would be difficult if not impossible for the Medical Center to hire RNs to replace the 40 to 50[8] discharged RNs. (Hrubetz Aff. at 3). [S]uch a decline in staffing levels would undoubtedly affect patient care and patient outcomes . . . Recently, a study was conducted demonstrating that low staffing levels had a direct correlation to increased mortality rates of patients. (Id. at 4). The number of patients affected by the discharge of so many RNs could be very significant. The impact on the number of patients depends upon the areas in which these nurses currently work and the types of patients they serve. (Id.). If 40 to 50 RNs are discharged at the Medical Center, patients could be forced to go to another facility and/or they may be required to change physicians. For some patients, this could be detrimental to their care, particularly if they have acute and/or complex medical problems. (Id.). Another possible outcome of the loss of 40 to 50 nurses is that the Medical Center may be unable to provide services to patients or it may be forced to close services, areas or units in the hospital or take fewer patients. (Id.). If the Medical Center's NICU were to reduce or close services, this would have a very definite negative impact on patients in our community. (Id. at 6). The Medical Center also operates the Region's only burn unit. Any negative impact on this service could adversely affect any person residing in the St. Louis metropolitan area or Southwestern Illinois who suffers serious burns. (Id.)

Although the union objects to my consideration of any facts not found by the arbitrator, in support of its summary judgment motion it did provide a roster of the

---

[8]At the time Hrubetz testified, the parties believed the number of nurses subject to discharge under the arbitration award to be between 40 and 55. That number has been amended to 73.

registered nurses subject to discharge if the arbitration award were confirmed. This roster, according to the union, demonstrates that not all of the 73 nurses subject to discharge are full-time employees of the Medical Center. This is relevant for purposes of calculating the vacancy rate, which is based on full-time nursing positions rather than the actual number of registered nurses. By way of example, two part-time registered nurses may fill one full-time nursing position. The Medical Center does not dispute the fact that some of the 73 nurses subject to discharge are not full-time registered nurses, but its vacancy rate calculations assume that the loss of each registered nurse is equal to the loss of a nursing position. Neither party seems able (or willing) to tell me how many of these registered nurses are full-time nurses, or how many actual nursing positions are filled by the 73 nurses subject to discharge.

## Discussion

## This Action is Not Moot

At the conclusion of its supplemental summary judgment brief, the Medical Center posits that this action is now mooted by the adoption of the new collective bargaining agreement, which eliminates the union security provision at issue in the arbitration award. I disagree. This action to confirm an arbitration award is not mooted simply because the underlying collective bargaining agreement is no longer

in effect.  Here, I am being asked to enforce an arbitration award interpreting the old

agreement.  There is no dispute that the collective bargaining agreement was in

effect at the time of the arbitration and that the arbitrator had the authority under the

parties' agreement to resolve the grievance.  Under these circumstances, there

remains a justiciable controversy between the parties, and I have jurisdiction to

decide it.

## Standard of Review

This case is brought under § 301 of the Labor Management Relations Act, 29

U.S.C. § 185.  The scope of judicial review of arbitration awards under collective

bargaining agreements is extremely limited.  United Food and Commercial Workers,

AFL-CIO, CLC, Local No. 88 v. Shop 'N' Save Warehouse Foods, Inc., 113 F.3d

893, 894 (8th Cir. 1997).  A labor arbitration award is legitimate "as long as the

arbitrator's award 'draws its essence from the collective bargaining agreement' and

is not merely 'his own brand of industrial justice.'"  United Paperworkers Int'l

Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 36 (1987) (quoting United

Steelworkers of Am. v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597

(1960)).  "The courts are not authorized to reconsider the merits of an award even

though the parties may allege that the award rests on errors of fact or on

misinterpretation of the contract."  Misco, 484 U.S. at 29.  "As long as the arbitrator

is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Id.

Thus, "[i]n deciding whether an award draws its essence from the agreement, we must decide whether the award is simply a mistaken interpretation of the contract that we must uphold, or whether it violates the fundamental principle that an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." Int'l Paper Co. v. United Paperworkers Int'l Union, 215 F.3d 815, 817 (8th Cir. 2000). An arbitrator may look outside the collective bargaining agreement to assist in the interpretation of the agreement, but he must construe the collective bargaining agreement without amending it. Id.

### Enforcement of the Arbitration Award Would Not Violate Public Policy

Despite this deferential standard of review, an arbitration award may be unenforceable if it violates public policy. Eastern Associated Coal Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 62 (2000); W.R. Grace and Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum and Plastic Workers of Am., 461 U.S. 757, 766 (1983). This narrow exception arises from the general principle that courts may not enforce contracts that are contrary to public

policy. <u>Misco</u>, 484 U.S. at 42-43. The exception is limited to situations where enforcement of the award would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" <u>See Iowa Elec. Light and Power Co. v. Local Union 204 of Int'l Bhd. of Elec. Workers</u>, 834 F.2d 1424, 1427 (8th Cir.1987) (quoting <u>Muschany v. United States</u>, 324 U.S. 49, 66 , 65 (1945)). "'[T]he question of public policy is ultimately one for resolution by the courts.'" <u>Misco</u>, 484 U.S. at 43 (quoting <u>W.R. Grace</u>, 461 U.S. at 766). "Once the public policy question is raised, courts answer it by taking the facts as found by the arbitrator, but reviewing his conclusions de novo." <u>Iowa Elec.</u>, 834 F.2d at 1427.

The Medical Center contends that enforcement of the award would violate public policy because it requires the simultaneous discharge of 73 nurses. It argues that a nursing shortage would make it difficult, if not impossible, to replace these nurses, with the result that it may be unable to maintain a nursing staff sufficient to meet patient needs. The Medical Center contends that Missouri's Hospital Licensing Law and its implementing regulations[9], along with the Missouri Nursing

---

[9]The Hospital Licensing Law, Mo. Rev. Stat. § 197.010 <u>et seq.</u>, has the stated purpose "to provide for the development, establishment and enforcement of standards for the care and treatment of individuals in hospitals and for the

Practice Act[10], require it to maintain adequate nursing staff and establish the "well-defined public policy" at issue in this case. According to the Medical Center, to

---

construction, maintenance and operation of hospitals, which, in the light of advancing knowledge, will promote safe and adequate treatment of such individuals in hospitals." Mo. Rev. Stat. § 197.030. The Hospital Licensing Law addresses the issues of adequate nurse staffing, methodology and minimum requirements as follows:

> 1. All hospitals and ambulatory surgical centers shall develop and implement a methodology which ensures adequate nurse staffing that will meet the needs of patients. At a minimum, there shall be on duty at all times a sufficient number of licensed registered nurses to provide patient care requiring the judgment and skills of a licensed registered nurse and to oversee the activities of all nursing personnel.
>
> 2. There shall be sufficient licensed and ancillary nursing personnel on duty on each nursing unit to meet the needs of each patient in accordance with accepted standards of quality patient care.

Id. at § 197.289. Since the law's enactment in 1953, Missouri has required each hospital to obtain a license from the Department of Health and Senior Services, and the Medical Center is duly licensed by this department to operate as a hospital in the State of Missouri. The Department has been given authority by the Missouri legislature to promulgate all necessary rules and regulations to implement the Hospital Licensing Law. These rules and regulations appear in Missouri's Code of Regulations at Title 19, §§ 30-20.011 et seq.

[10]The Missouri Nursing Practice Act, Mo. Rev. Stat. § 335.011 et seq., created the Missouri State Board of Nursing, which licenses and regulates nurses and nursing care in Missouri. The statute also sets standards for the approval of nursing schools within Missouri, determines the scope of practice of licensed nurses, defines which persons may use the titles of "registered nurse" and "licensed practical nurse" in Missouri.

enforce the arbitration award would be inconsistent with these laws and their underlying policies of providing quality patient care.

In Iowa Elec., the Eighth Circuit Court of Appeals upheld the district court's decision to vacate an arbitration award on public policy grounds. 834 F.2d at 1430. In that case, the arbitrator had ordered the reinstatement of a nuclear power plant employee who was discharged for violating a safety regulation designed to protect the public from exposure to nuclear hazards. Id. at 1427. The appellate court concluded that a well defined and dominant national policy requiring strict adherence to nuclear safety rules would be violated if an employee who knowingly violated those rules were reinstated. Id. To determine that the public policy was explicit and well-defined, the court relied on the voluminous statutory and regulatory framework governing the nuclear-power industry, as well as the unique dangers and attendant safety requirements of the industry. Id. at 1428.

In contrast, the Eighth Circuit Court of Appeals failed to find a well defined and explicit public policy that would be violated by enforcing a reinstatement award in MidAmerican Energy Co. v. Int'l Bhd. of Elec. Workers Local 499, 345 F.3d 616, 620 (8th Cir. 2003). In that case, the district court rejected an employer's public policy defense and confirmed an arbitration award ordering the reinstatement of a natural gas employee who was discharged for leaving his post unattended. Id.

at 621.  On appeal, the court agreed that enforcing the arbitrator's award would not violate public policy.  Id. at 622.  It noted that although the natural gas industry is regulated by the federal government, the regulatory framework is generalized and lacks specific and exacting requirements.  Id. at 621.  For this reason, the appellate court was unable to discern the type of explicit safety concerns sufficient to vacate the arbitration award on public policy grounds.  Id.

The Medical Center argues that Missouri's Hospital Licensing Law and the Missouri Nursing Practice Act provide the type of explicit and well-defined public policy found by the Eighth Circuit in Iowa Elec., while the union asserts that the statutes are analogous to those rejected by the Eighth Circuit in MidAmerican Energy Co.  Although there undoubtedly is a public policy to promote quality healthcare in Missouri, I conclude that these statutes do not evidence an explicit public policy that would be violated if Arbitrator Cipolla's award is confirmed.

The Missouri Hospital Licensing Law is general in nature, requiring only that "[a]ll hospitals and ambulatory surgical centers shall develop and implement a methodology which ensures adequate nurse staffing that will meet the needs of patients."  Mo. Rev. Stat. § 197.289. While it does provide that "[a]t a minimum, there shall be on duty at all times a sufficient number of licensed registered nurses to provide patient care requiring the judgment and skills of a licensed registered nurse

and to oversee the activities of all nursing personnel," id., it does not provide any

specific guidelines as to what the minimum number of nurses should be or how the

hospital should make that determination.  The same is true of the statute's

requirement that "[t]here shall be sufficient licensed and ancillary nursing personnel

on duty on each nursing unit to meet the needs of each patient in accordance with

accepted standards of quality patient care."  Id.

The statute and Missouri's Department of Health and Senior Services permit

a hospital such as the Medical Center to decide how to meet the necessary

requirements, and the evidence in this case has shown that there are many factors

that the Medical Center can and does consider when determining whether its nursing

staff is sufficient to meet patient needs.  Under these circumstances, the statute

simply does not provide the specific and exacting requirements necessary to

evidence a public policy that would be violated if the arbitration award were

confirmed in this case.

The Medical Center's attempt to establish an explicit public policy by relying

on the Missouri Nursing Practice Act fails for the same reason.  Although the statute

sets standards for the licensing and regulation of nurses and nursing care in

Missouri, it contains no specific requirements about the number of nurses needed to

adequately meet patient needs.  Without this level of specificity, I am unable to

conclude that these statutory and regulatory provisions evidence an explicit public policy that would be violated if the arbitration award were enforced.

Even if the Medical Center could point to an explicit and well-defined public policy in this case, it has not demonstrated that enforcement of the award would actually violate such a policy. The Medical Center has never asserted that it would reduce or eliminate certain services or that it would fall out of compliance with state regulations if forced to comply with the arbitration award. Instead, the Medical Center merely speculates that one or more of these outcomes *could* occur -- not that they *will* occur, or even that they are *likely* to occur -- if they are forced to discharge 73 nurses. To support its position, the Medical Center places great reliance on its calculated vacancy rates for affected nursing units, particularly critical care units, if 73 nurses were discharged. The problem with relying on this evidence is that the calculations are inaccurate. The Medical Center assumed the loss of 73 nursing positions, even though some of the nurses subject to discharge are part-time employees. As I explained above, neither party was either willing or able to provide me with the actual number of affected nursing positions if the arbitration award were enforced, although there is no dispute that the number is less than 73. As it is the Medical Center's burden to prove the validity of its public policy defense, the Medical Center has fallen short of demonstrating the impact that enforcement of the

award would have on its vacancy rate.[11]

Even if accurate, the vacancy rates may overstate the impact that enforcement of the award could have on staffing levels because they do not take into account the staffing provided by temporary and per diem nurses. The undisputed evidence in the record demonstrates that the Medical Center already employs temporary and per diem nurses on a regular basis. Although there was some testimony that it might be difficult to fill some specialized nursing positions through temporary nursing agencies, there was no evidence that these positions could not be filled by per diem nurses, or that replacement nurses could eventually be located through a temporary agency.

Finally, the vacancy rates cited by the Medical Center are not dispositive for purposes of deciding whether enforcing the award would violate public policy because the rates are dependent upon factors such as budgetary issues and the number of hospital beds. As such, the vacancy rate is subject to manipulation by the Medical Center and is not an absolute indicator of the minimum number of nursing positions actually needed to sufficiently meet patient needs. Although the discharge of 73 nurses will undoubtedly increase the number of vacant positions at the

---

[11]In its decision, the NLRB also noted inconsistencies in the Medical Center's calculation of its vacancy rate.

Medical Center, the vacancy rates cited by the Medical Center in its summary judgment papers are inaccurate, inflated and do not justify vacating the arbitration award on public policy grounds.

Moreover, the Medical Center has not met its burden of demonstrating that enforcement of the award would violate public policy through the proffered testimony of its expert witness Hrubetz. I have reviewed her testimony, but I do not find it particularly relevant or helpful in establishing a public policy violation in this case because it is vague and lacks supporting evidence. For example, Hrubetz makes sweeping generalizations that patient care would undoubtedly suffer if nurses were discharged from the Medical Center, but she fails to offer any specific analysis as to how the firings would actually impact patient care. Moreover, her testimony is flawed because she assumes the loss of 73 nursing positions which, as discussed above, is not an accurate assumption. For these reasons, her testimony does not demonstrate that any explicit public policy would be violated if the arbitration award were enforced in this case.

Also undercutting the Medical Center's position is the undisputed evidence that it was able to operate at sufficient staffing levels during the nurses' strike in December of 2004. Crain testified that the Medical Center used temporary and other nurses to meet its staffing needs during the strike, and that the Missouri

Department of Health and Senior Services inspected the hospital and certified that it was in compliance despite the staffing shortage. Although Crain testified that these resources were primarily available on a temporary basis, she admitted that she did not know whether these or similar resources could be called upon again to fill any staffing shortages created by enforcing the arbitration award in this case. This is significant because the current collective bargaining agreement does not contain a union security provision. The Medical Center has argued that this action is mooted by the new agreement because it could simply rehire the nurses it would be forced to discharge if the award were confirmed.[12] While this does not moot the instant confirmation proceeding, if true it certainly undermines the Medical Center's position that enforcing the award would leave it unable to meet its staffing needs.

Based on the record before me, I conclude that the Medical Center has failed to meet its burden of demonstrating that enforcement of the arbitration award would violate public policy. The Medical Center's motion to vacate the arbitration award on this ground must be denied.

---

[12]The union has refused to take a position on the Medical Center's ability to immediately rehire the discharged nurses for undisclosed reasons.

## The Arbitrator Did Not Exceed
## His Authority By Ordering a Monetary Award

Finally, the Medical Center argues that the award should be vacated because the arbitrator exceeded his authority by ordering the Medical Center to pay the unpaid dues and fees to the union. The collective bargaining agreement provides that the arbitrator "shall not add to, subtract from, or modify in any way the terms of this Agreement . . . ." The Medical Center contends that the arbitrator violated this provision because the agreement requires the nurses to pay the union dues and fees and does not make the Medical Center liable in the event that they fail to do so. Instead, Article 4.2 of the  provides that "[t]he failure of any RN to become or remain a member of the Union at such required time by paying initiation fees and regular monthly dues uniformly required by a condition of membership shall obligate the Medical Center, upon written notice from the Union to such effect and to the further effect that Union membership was available to such RN on the same terms and conditions generally available to other members, to discharge such RN within ten (10) working days following the receipt of such notice."                     As stated above, "[j]udicial review of a final arbitration award is extremely narrow." Trailmobile Trailer, LLC v. Int'l Union of Elec., 223 F.3d 744, 747 (8th Cir. 2000). "As long as the arbitrator's award draws its essence from the collective bargaining

agreement, and is not merely his own brand of industrial justice, the award is legitimate." Misco, 484 U.S. at 36. "This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations." Enterprise Wheel, 363 U.S. at 597.

Applying these standards, I must uphold Arbitrator Cipolla's award. The Medical Center permitted the nurses to continue working despite their continued failure to pay union fees and dues, and in doing so, breached the provisions of the collective bargaining agreement. I find it well within the discretion of the arbitrator to order the Medical Center to pay these outstanding fees and dues as a remedy for its failure to comply with its obligations under the agreement. Because Arbitrator Cipolla was vested with the authority to decide this issue under the agreement and his decision draws its essence from the agreement, I cannot supplant the arbitrator's judgment with my own. For this reason, the award must be confirmed.

## Conclusion

Because Arbitrator Cipolla's arbitration award draws its essence from the collective bargaining agreement and does not violate public policy, I will grant the union's motion to confirm the award in its entirety and deny the Medical Center's counterclaim to vacate the award.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion for summary judgment [#8] is granted, and the arbitration award issued by Arbitrator Cipolla on April 2, 2004, is confirmed in its entirety.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment [#11] is denied, and defendant's counterclaim is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

 

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this <u>22nd</u> day of <u>September</u>, 2005.